

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00250-CR

_____

JACOBY DEJUAN ROBERTS JR., Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. 1782383

---

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

### I.  Introduction

Appellant Jacoby Dejuan Roberts Jr. appeals his conviction for the capital murder of his cousin Jailon Freeman (the victim) while committing terroristic threat for which he was sentenced to confinement for life without parole.  *See* Tex. Penal Code § 19.03(a)(2).  In two points, Appellant argues (1) that the trial court erred in the court's charge by failing to apply the law of self-defense to the particular facts of his case and that he was egregiously harmed as a result of that error and (2) that the trial court abused its discretion by admitting his custodial statement because he had not received his Article 38.22[1] and *Miranda*[2] warnings and had not voluntarily waived them.  Because we conclude that there was no charge error or alternatively that Appellant was not egregiously harmed by the self-defense instruction in the charge and because Appellant was not in custody when he made the challenged statement and thus no warnings were required, we affirm.

---

[1]*See* Tex. Code Crim. Proc. art. 38.22.

[2]*See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

## II. Background[3]

### A.    The State's Case

Appellant killed the victim when he arrived at a fake drug buy that Appellant had set up. Jordan Thurman, who was indicted as a co-conspirator for the victim's capital murder, testified that he was friends with Draylon Gowans (the buyer); he had never personally met Appellant nor the victim. On April 4, 2023, the buyer called him and asked him to take him to purchase narcotics and directed him to the victim's apartment.

After they arrived at the apartment complex, Thurman saw somebody wearing a mask and blue gloves shoot the victim in the back of the head, so he drove off. Thurman did not see the victim with a firearm at any point, though he said that he had not been paying attention the whole time. Thurman opined that the victim did not see the shooter.

---

[3]Appellant's brief includes a three-sentence "Statement of Facts" despite that the trial lasted four days. Although Texas Rule of Appellate Procedure 38.1(g) allows the facts to be stated concisely, *see* Tex. R. App. P. 38.1(g), we note that Appellant's statement of facts does not include any facts relevant to his self-defense argument beyond two conclusory statements—that he admitted shooting the victim in self-defense and that he did not rob the victim. We do not condone counsel's practice of omitting relevant facts, and we remind counsel that he owes this court a duty of candor. *See* Standards for Appellate Conduct, *Lawyers' Duties to the Court* ¶ 3, Texas Rules of Court (State) 336 (West 2026), https://www.txcourts.gov/media/1437423/standards-for-appellate-conduct.pdf ("Counsel should not misrepresent, mischaracterize, misquote, or miscite the factual record . . . ."); Tex. Disciplinary Rules Prof'l Conduct R. 3.03 (explaining the duty of candor toward the tribunal).

Keshawn Lighten (the driver)[4] testified that he knew that Appellant sold drugs, specifically cocaine, and that the victim was his supplier. The driver believed that Appellant and the victim had an agreement in place and that the victim was not "doing his part" regarding payment. The driver recalled that Appellant and the victim had a falling out because the victim had not paid Appellant. Appellant planned to rob the victim of the drugs and sell them in order to get some money for his son. The driver said that it was not Appellant's conscious objective to kill the victim, but if it came down to it, Appellant was willing to kill the victim "over the drugs."

The driver testified that Appellant called him on FaceTime on April 4, 2023, and said that he had done it, which the driver interpreted as Appellant's having robbed the victim. Appellant later told the driver that he had robbed the victim and "had to kill him." The driver testified at trial that Appellant had told him that the victim "knew what was going on" and had tried to pull a gun first but that Appellant had ended up shooting him first. The driver understood that Appellant had taken drugs from the victim.

The driver picked up Appellant and planned to take him somewhere so that he could clear his head. Shortly after they left the neighborhood, the police stopped the vehicle. The driver could not recall if Appellant was read his rights or if the police

---

[4]We use the term "the driver" because he was the one who was driving when the police stopped the car in which Appellant was riding.

4

controlled his movements, but he did not think that Appellant would have felt free to leave because he knew what he had done.

Fort Worth Police Detective Jerry Cedillo, along with five other detectives, responded to the Woodmont Apartments on April 4, 2023. The victim's girlfriend identified the body and said that Appellant might have been involved. Detective Cedillo saw two cell phones, a firearm, and a cartridge casing near the victim's body. One of the cell phones was on and had messages on the screen, and those messages helped identify persons of interest. Surveillance cameras showed (1) an individual who was wearing all black, a ski mask covering most of his face, and blue latex gloves and was walking through the parking lot and (2) two cars that left shortly after the shooting. Because they had a person of interest, officers set up surveillance at Appellant's house and saw a vehicle pull up to the house; a man came out of the house and left in the vehicle, which officers subsequently stopped for an expired vehicle registration.

One of the detectives who responded to the Woodmont Apartments went to the scene of the traffic stop and spoke with Appellant. Detective Cedillo arrived later and said that neither Appellant nor the driver were arrested or handcuffed. They agreed to speak with Detective Cedillo, and separate patrol officers transported them to the interview room at the homicide office.

Detective Cedillo spoke with the driver first and then Appellant. Detective Cedillo said that Appellant was not handcuffed and that he had told Appellant that he

was free to leave. Appellant initially denied that he was at the Woodmont Apartments and said that someone named Larry might have killed the victim. Appellant changed his story when Detective Cedillo mentioned that they knew his car had been at the apartment complex. Appellant claimed that the victim had pulled a gun on him and that he had panicked and had taken the victim's gun, but not his cocaine, before leaving the scene.

Detective Cedillo seized Appellant's cell phone during the interview, and another detective performed an extraction on Appellant's cell phone. Detective Cedillo reviewed the contents of the "cell phone dump" after the interview and learned that Appellant and the buyer were associates and that the two had planned the robbery. Texts messages between Appellant and the buyer revealed that the two had started planning on April 1 to sneak up on the victim and come out from between two buildings. The two formalized the plan, with the buyer bringing his friend (Thurman) on the day the victim was murdered. Based on Detective Cedillo's investigation, he concluded that the buyer was going to act as a "fictitious customer," while Appellant was the one who was going to commit the robbery. The text-message thread revealed that the buyer and Appellant kept each other updated on their locations, and at 2:23:05, the texts showed that the victim was on the way. At 2:28, the buyer asked if Appellant had retrieved the victim's phone, and he replied, "He reached first." Detective Cedillo interpreted that to mean that the victim had reached for his gun first.

Detective Cedillo testified that the text messages demonstrated that "this was a preplanned event" and that Appellant "was there to rob [the victim]." When asked why he did not believe Appellant's claim of self-defense, Detective Cedillo said

> because of what was previously stated in the interview. You know, the way he's dressed. He's got a gun. I had already learned that he was meddling some deals with [the victim], and even through his own statement, he admits that this was all over money. It was $500 that he was upset about [the fact] that [the victim] hadn't been paying him. So all this contributed to a robbery that took place that was planned.

Although Appellant claimed that there was no robbery and no plan to rob and that this was just supposed to be a confrontation in which he told the victim that he needed his money, when the buyer had texted Appellant, "My potna [Thurman] don't kno that you finna to rob dude," Appellant did not refute that statement but instead responded in a way confirming that was the plan. Moreover, according to Detective Cedillo, Appellant admitted the robbery when he said that he had taken the victim's gun, and the evidence showed that he had also taken the victim's cocaine.[5]

Dr. Kendall Crowns, the Chief Medical Examiner at the Tarrant County Medical Examiner's Office who performed the victim's autopsy, testified that the victim had a single gunshot wound to the left side of the back of his head slightly behind his left ear. The bullet proceeded from the left hemisphere of the cerebellum

---

[5]When officers executed a search warrant on Appellant's home, they collected blue rubber gloves, black clothes, and a backpack. The backpack contained a Smith & Wesson SD40 with a magazine inside it, a box of "blue throwaway gloves," Hornady 9 mm Luger ammunition, and a grocery sack filled with 146 grams of a white powdery substance.

and continued until it lodged in the right parietal lobe of the brain; there was no exit wound. Due to the absence of soot and stippling near the gunshot wound entrance, she opined that the gun was fired at a range of more than two feet away from the victim. She believed that the shooter had been behind the victim, specifically back and to the left, but she stated that because the human body is a three-dimensional object, "he could [have been] turned in a number of ways that could discount that." She noted that the victim had multiple abrasions to the right side of his face and opined that they were probably from falling after he was shot. Dr. Crowns further opined that the victim's cause of death was a gunshot wound to the head and that the manner was homicide.

## B. The Defense's Case

The defense called one of the paramedics who had responded to the Woodmont Apartments. He testified that the victim had what appeared to be a gunshot wound above his right eyebrow and a wound behind his left ear.

Appellant testified at trial and said that he and the victim had entered into a drug conspiracy. The two agreed that Appellant would receive fifty percent of whatever profit they made. When making drug sales, the victim carried a gun and advised Appellant to get a gun.

The victim kept the drugs at his aunt's apartment, and one of Appellant's interactions with the victim at that apartment caused him to believe that the victim was becoming violent. According to Appellant, the victim said that he was "ready for

8

someone to play with him just so he [could] kill someone." Appellant said that the victim's energy at the time frightened him because he had never seen the victim like that before.

Despite Appellant and the victim's agreement to split the profit, the victim refused to pay Appellant. So Appellant set up the transaction involving the buyer in order to put money into the victim's hands.

Appellant testified that his intention in going to the victim's apartment on April 4, 2023, was to talk to him to see if he could get the money he was owed and that he carried a gun "just in case." Appellant claimed that he did not intend to threaten, hurt, rob, or kill the victim. Appellant further said that he had not made any statements to the buyer that he was going to rob the victim but that the buyer was under that impression because Appellant had told him that the victim was avoiding him.

Appellant testified that his face was not covered when he met with the victim. According to Appellant, he asked the victim if he had the money he was owed, and the victim turned around and pulled his gun from his hoodie pocket;[6] Appellant "reacted and defended [him]self" because he was in fear for his life. Appellant admitted that he had shot and killed the victim.

---

[6]Other places in the record, Appellant testified that as the victim reached for his gun in his hoodie pocket, Appellant reached for his gun and shot the victim. And Appellant clarified that the victim did not shoot because his gun "got caught up in his hoodie pocket."

Afterwards, Appellant dropped his gun. He picked up the victim's gun because he thought it was his own and also picked up a white bag; he then put his ski mask over his face and took off running. After Appellant got back in his car, he texted the buyer that the victim had reached first.

Appellant went home and showered and then called the driver. Appellant wanted the driver to pick him up and get away from the area because he was in fear for his life; he believed that his family might retaliate against him.

Appellant testified about when he and the driver were stopped. He said that he was not read his rights, that he did not feel like he was free to leave, that one of the officers had his hand on his gun when he asked Appellant to step out of the car, that he was frisked multiple times, that he was put up against a wall and photographed, that an officer had put a hand on him when he had given him to another officer, and that there were no handles on the doors inside the patrol vehicle. He further testified that an officer accompanied him at the station and that he did not feel free to leave even though Detective Cedillo told him that he could.

During cross-examination, Appellant was adamant that he had not planned on robbing the victim and that he did not rob the victim. When it was pointed out that one of the exhibits showed him running with the cocaine and the victim's gun that he had taken, Appellant said, "I did not plan on doing that. That was something that happened after the fact." And when confronted with his testimony that the victim's gun never came out because it had gotten caught in his hoodie pocket, Appellant said,

"I knew where he kept his gun, and he's always showed me." Appellant initially said that he wore gloves "[j]ust in case [the victim] wanted to pay [him] in cocaine" but later admitted that he had told Detective Cedillo that he had worn gloves because he did not know where the gun had come from. He also admitted that he had texted the buyer beforehand about where they should position themselves. But Appellant did not feel like it was necessary for him to correct the buyer when he texted, "My potna don't kno that you finna rob dude"; Appellant stated that the buyer was not his friend and that he did not think he needed to tell him what was actually going on. But when asked why Appellant had texted the buyer that the victim had reached first, Appellant said that his thinking was frantic because he was scared for his life.

Appellant denied having committed capital murder but admitted that he had pulled the trigger and had shot the victim in the head. Appellant said that when he shot his gun, he was looking at the victim's face; he claimed that he did not shoot the victim in the back of the head.

### C.    The Outcome

After hearing the evidence, the jury found Appellant guilty of capital murder as charged in the indictment, and Appellant received an automatic life sentence without the possibility of parole. This appeal followed.

### III.  Jury-Charge Challenge

In his first point, Appellant argues that the trial court erred in the court's charge by failing to apply the law of self-defense to the particular facts of his case and

11

that he was egregiously harmed as a result of such failure. Based on our review of the charge and the record, we conclude that the charge was not erroneous and alternatively that any error did not cause Appellant egregious harm.

## A.    Standard of Review and Applicable Law

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). "Preservation of charge error does not become an issue until we assess harm." *Thanh Cuong Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). "The degree of harm necessary for reversal depends on whether the appellant preserved the error by objection." *Id.* "When the defendant fails to object or states that he has no objection to the charge, we will not reverse for jury-charge error unless the record shows 'egregious harm' to the defendant." *Id.* at 743–44 (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). "Thus, we review alleged charge error by considering two questions: (1) whether error existed in the charge; and (2) whether sufficient harm resulted from the error to compel reversal." *Id.* at 744.

Under Texas Code of Criminal Procedure Article 36.14, the trial court must deliver a written charge to the jury that sets forth the law applicable to the case. Tex. Code Crim. Proc. art. 36.14. "Because the charge is the instrument by which the jury convicts, [it] must contain an accurate statement of law and must set out all the essential elements of the offense." *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim.

12

App. 2012) (quoting *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995)). The charge must make clear to the jury the circumstances under which it should convict and the circumstances under which it should acquit the defendant. *Gray v. State*, 152 S.W.3d 125, 127–28 (Tex. Crim. App. 2004). "Generally, a jury charge that tracks statutory language is not erroneous." *Lewis v. State*, 693 S.W.3d 453, 464 (Tex. App.—Houston [14th Dist.] 2023, pet. ref'd).

An application paragraph should apply the specific charges alleged against the defendant to the evidence presented at trial. *Reeves v. State*, 420 S.W.3d 812, 817 (Tex. Crim. App. 2013); *Vasquez*, 389 S.W.3d at 367; *Davis v. State*, No. 09-15-00148-CR, 2017 WL 1535102, at *5 (Tex. App.—Beaumont Apr. 26, 2017, no pet.) (mem. op., not designated for publication). The application paragraph must (1) specify all conditions that must be met before a conviction is authorized, (2) "authorize a conviction under conditions specified by other paragraph[s] of the jury charge to which the application paragraph necessarily and unambiguously refers," or "(3) contain[] some logically consistent combination of such paragraphs." *Vasquez*, 389 S.W.3d at 367 (inner quotation marks omitted) (quoting *Plata v. State*, 926 S.W.2d 300, 304 (Tex. Crim. App. 1996), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997)); *Davis*, 2017 WL 1535102, at *5. In short, the charge must "apply the law to the facts adduced at trial." *Gray*, 152 S.W.3d at 127; *Davis*, 2017 WL 1535102, at *5.

Texas courts have held that when a defendant claims self-defense, his rights are fully preserved when a jury charge (1) states that a defendant's conduct is justified if he reasonably believed that the deceased was using or attempting to use unlawful deadly force against the defendant and (2) correctly defines "reasonable belief." *Bundy v. State*, 280 S.W.3d 425, 430 (Tex. App.—Fort Worth 2009, pet. ref'd) (citing *Valentine v. State*, 587 S.W.2d 399, 401 (Tex. Crim. App. [Panel Op.] 1979)); *Baty v. State*, No. 09-24-00252-CR, 2026 WL 1476548, at *14 (Tex. App.—Beaumont May 27, 2026, no pet. h.) (mem. op., not designated for publication). "Reasonable belief" is a belief that an ordinary and prudent person in the same circumstances as the defendant would hold. Tex. Penal Code § 1.07(a)(42).

## B. The Jury Charge

During the charge conference, the trial court stated that it had prepared a proposed jury charge using the State Bar's Pattern Jury Charges and that it had included "some anticipated instructions," one of which was "a self-defense charge with a presumption." Both sides' counsel were given an opportunity to review the proposed charge. The remainder of the charge conference occurred off the record. At the end of the conference, the trial court summarized the changes that had been made to the proposed charge, specifically that they had "tweaked self-defense with additional definitions. It has . . . presumption language that the State has to prove beyond a reasonable doubt does not apply in this case, and then apply self-defense to the facts of the case." Defense counsel asked

14

for some proposed language that if we deal with self-defense, we request the language to the effect of the reasonableness of a particular use of force by the actor must be judged from the perspective of a reasonable actor at the time of the offense or act committed rather than with 20/20 vision of hindsight.

The trial court denied that request.

In the final version of the jury charge, after instructing the jury that if it agreed that "the State has proved, beyond a reasonable doubt, each of the elements for one of the offenses listed above, you must next consider whether [Appellant] is not guilty because his use of force was justified by self-defense," the charge explained self-defense as follows:

### SELF-DEFENSE

You are instructed that a person is justified in using force against another when and to the degree that the actor reasonably believes the force is immediately necessary to protect the actor against the other person's use or attempted use of unlawful force.

A person is justified in using deadly force against another if the actor would be justified in using force against the other, as set out above, and when and to the degree the actor reasonably believes the deadly force is immediately necessary to protect the actor against the other person's use or attempted use of unlawful deadly force.

Self-defense does not cover conduct in response to verbal provocation alone. [Appellant] must have reasonably believed the other person had done more than verbally provoke [Appellant].

The law of self-defense may apply either to the charged offense of capital murder or the lesser-included offense of felony murder.

The jury charge set forth definitions for "reasonable belief" and "deadly force" as follows:

15

- **"*Reasonable belief*"** means the reasonableness of the actor's belief must be viewed from the actor['s] viewpoint at the time [he] acted.

  . . . .

- **"*Deadly force*"** means force that is intended or known by the person using it to cause death or serious bodily injury or force that in the manner of its use or intended use is capable of causing death or serious bodily injury.

After setting forth definitions, the jury charge included sections on presumption, burden of proof, and application of law to facts:

## PRESUMPTION

Under certain circumstances, the law creates a presumption that [Appellant's] belief—that the deadly force he used was immediately necessary—was reasonable. A presumption is a conclusion the law requires you to reach if certain other facts exist.

Therefore, you must find [Appellant's] belief—that the deadly force he used was immediately necessary—was reasonable unless you find the State has proved, beyond a reasonable doubt, at least one of the following elements. The elements the State must prove are that[]

1. [Appellant] provoked the person against whom the force was used; or

2. [Appellant], at the time the deadly force was used, was engaged in criminal activity other than a [C]lass C misdemeanor that is a violation of a law or ordinance regulating traffic.

If you find the State has proved, beyond a reasonable doubt, element 1 or 2 listed above, the presumption does not apply[,] and you are not required to find that [Appellant's] belief was reasonable.

Whether or not the presumption applies, the State must prove, beyond a reasonable doubt, that self-defense does not apply to this case.

16

**BURDEN OF PROOF**

[Appellant] is not required to prove self-defense. Rather, the State must prove, beyond a reasonable doubt, that self-defense does not apply to [Appellant's] conduct.

**APPLICATION OF LAW TO FACTS**

To decide the issue of self-defense, you must determine whether the State has proved, beyond a reasonable doubt, one of the following two elements. The elements the State must prove are that[]

1. [Appellant] did not believe his use of force was immediately necessary to protect himself against [the victim's] use or attempted use of unlawful deadly force; or
2. [Appellant's] belief was not reasonable.

Before you may find [Appellant] guilty, you must all agree that the State has proved, beyond a reasonable doubt, either element 1 or 2 listed above. You need not agree on which of these elements the State has proved.

If you find that the State has failed to prove, beyond a reasonable doubt, either element 1 or 2 listed above, you must find [Appellant] "not guilty."

If you all agree [that] the State has proved, beyond a reasonable doubt, each of the elements of the charged offense of capital murder or the lesser-included offense of murder, and you all agree [that] the State has proved, beyond a reasonable doubt, either element 1 or 2 listed above, you must find [Appellant] "guilty."

**C.  Analysis**

Here, Appellant concedes that "[t]he abstract portion of the court's charge instructed the jury on some of the elements of self-defense," but he argues that the application portion of the charge did not apply the law of self-defense to the particular facts of his case. Appellant ignores that the application portion of the

charge tracks the "Application of Law to Facts" model given in the Texas Criminal Pattern Charges for self-defense involving deadly force. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Criminal Pattern Jury Charges—Criminal Defenses* CPJC 32.2 (2018); *cf. Trejo v. State*, No. 03-18-00221-CR, 2020 WL 1313735, at *6 (Tex. App.—Austin Mar. 20, 2020, no pet.) (mem. op., not designated for publication) (setting forth self-defense charge, including application-of-law-to-facts section; noting that the charge tracked the instructions and definitions set forth in the Texas Criminal Pattern Jury Charges as to a defendant's claim of self-defense for an offense involving the use of deadly force; and holding that such charge did not "misle[a]d the jury" or "improperly limit[ ] his claim of self-defense" through a merging of jury instructions on provocation and seeking an explanation while carrying a weapon); *Preston v. State*, No. 03-16-00573-CR, 2018 WL 3447713, at *11–12 (Tex. App.—Austin July 18, 2018, no pet.) (mem. op., not designated for publication) (concluding that defendant was not egregiously harmed by inclusion of self-defense instruction that tracked instruction from criminal pattern jury charge); *cf. Mateen v. State*, No. 03-22-00516-CR, 2024 WL 2741290, at *7 (Tex. App.—Austin May 29, 2024, pet. ref'd) (mem. op., not designated for publication) (noting that the Texas Pattern Jury Charges are not law but are heavily relied on by both the bench and the bar).

Appellant also claims that "[t]he court's charge merely informed the jury that they were to find [him] guilty if they found that the State disproved the presumption that [he had] acted reasonably." It is clear, however, from the two-and-a-half pages of

18

the charge that are set forth above that it did not "merely" inform the jury about finding him guilty if the State disproved the presumption but instead explained self-defense, set forth definitions, and applied the law to the facts. Furthermore, the charge stated that "[w]hether or not the presumption applies, the State must prove, beyond a reasonable doubt, that self-defense does not apply to this case."

Appellant's brief then includes seven paragraphs that each start with the following: "The court's charge failed to apply the law to the facts in instructing the jury . . . ." For example, Appellant's brief states,

> The [court's] charge failed to apply the law to the facts in instructing the jury [it] must believe beyond a reasonable doubt that Appellant provoked the occasion in question before [it] could find he was not presumed to have acted in self-defense [if the victim] used force or deadly force against him or was committing or attempting to commit murder.

But as noted by the State, "Appellant does not favor the State or [the c]ourt with an explanation of how the trial court could have better applied 'the factual circumstances of the case' without commenting on the weight of the evidence."[7] [Brief reference omitted.] *See generally* Tex. Code Crim. Proc. art. 36.14 (requiring judge to deliver to the jury "a written charge distinctly setting forth the law applicable to the case; not

---

[7]Within one of these paragraphs, Appellant mentions his having a right to be present at the location and his not being required to retreat before using deadly force. We agree with the State that no instruction on "no duty to retreat" was required. *See McDow v. State*, No. 05-17-01201-CR, 2019 WL 2590968, at *8 (Tex. App.—Dallas June 25, 2019, no pet.) (mem. op., not designated for publication) ("[T]he no[-]duty[-]to[-]retreat provisions do not apply if the defendant was engaged in criminal activity at the time he used deadly force.").

19

expressing any opinion as to the weight of the evidence, not summing up the testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury"); *Beltran De La Torre v. State*, 583 S.W.3d 613, 617 (Tex. Crim. App. 2019) (stating that the court may not express an opinion on the weight of the evidence or draw the jury's attention to particular facts).

Having reviewed the charge, we cannot say that the trial court's instruction on self-defense contained error, especially when Appellant does not challenge the law it set forth on self-defense. *See Baty*, 2026 WL 1476548, at *15 (holding that trial court properly instructed the jury on the issue of self-defense and that the jury charge was not erroneous when the instructions tracked the statute's definition regarding self-defense, deadly force, and reasonable belief); *see also Perkins v. State*, No. 08-19-00068-CR, 2021 WL 754344, at *4 (Tex. App.—El Paso Feb. 26, 2021, pet. ref'd) (not designated for publication) (holding no error in charge when appellant failed to specify the particular instruction that the trial court should have given and when the charge specifically identified the person who believed that force was immediately necessary to protect himself or others and the person using or attempting to use the unlawful force).

Even if there were error in the charge, Appellant failed to object to the charge on the ground asserted here. That failure would require an additional finding of "egregious harm" in order to justify reversal. *See Thanh Cuong Ngo*, 175 S.W.3d at

743–44. In making an egregious-harm determination, we must consider "the actual degree of harm . . . in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel[,] and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171. *See generally Gelinas v. State*, 398 S.W.3d 703, 708–10 (Tex. Crim. App. 2013) (applying *Almanza*). Errors that result in egregious harm are those "that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *Taylor v. State*, 332 S.W.3d 483, 490 (Tex. Crim. App. 2011) (citing *Almanza*, 686 S.W.2d at 172).[8]

We therefore conduct an egregious-harm determination using the *Almanza* factors:

- Here, the actual degree of harm in light of the jury charge in its entirety is minimal, if any. The charge made clear that the jury must find Appellant not guilty if the State failed to prove, beyond a reasonable doubt, either of the elements negating self-defense. This correct statement of law militates against finding any actual harm.

- The state of the evidence presented the jury with ample bases to reject Appellant's self-defense claim: the autopsy showed that the victim had been shot from behind, Appellant's texts to the buyer showed that he had planned to rob the victim, and the driver's testimony demonstrated that Appellant would kill if necessary to get the money he was owed.

---

[8]The Texas Court of Criminal Appeals recently applied *Almanza* to objected-to error in submitting the presumption involving the use of deadly force when it was not raised by the evidence. *See Cuevas v. State*, 735 S.W.3d 17, 27–32 (Tex. Crim. App. 2026).

The record evidence also militates against a finding of actual egregious harm.

- During closing arguments, the State made clear that it was the jury's job to follow the law and focused on the elements of capital murder. The State emphasized the inconsistencies in Appellant's testimony and the planning that was demonstrated in his text messages. The State briefly touched on self-defense, noting that the victim's force was never unlawful because he was ambushed by a person wearing a ski mask with a gun in his hand. Appellant's counsel argued that the theory of self-defense was not something they had concocted in representing Appellant nor was it something that Appellant had concocted when he was in front of the homicide detectives but instead was based on what Appellant had texted from the scene—that the victim drew first. Appellant's counsel stated, "If you believe self-defense doesn't fit, that's your decision. We just ask you to consider it." Defense counsel later reiterated that the victim had reached for his gun—had "started pulling it out"—after Appellant had asked him for the money he was owed, and that was why Appellant had reacted "in what he said was self-defense." Defense counsel closed by reminding the jury "to decide on the facts if self-defense applie[d]." The State emphasized in rebuttal that self-defense could not apply because "in your jury charge it says you don't get self-defense if you provoke somebody, which he did, or you're committing a crime. . . . Aggravated robbery. You don't get self-defense." Both sides thus emphasized applying the law to the facts, so this further militated against any egregious harm.

- Regarding any other relevant information, we consider whether the jury sent requests for clarification during deliberations. *See Smith v. State*, 515 S.W.3d 423, 431 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). The record reveals that the jury sent two notes requesting, among other things, copies of the charge, the coroner's report, photos of the victim's body and evidence related to its location, phone-message history, and security footage of Appellant and the victim. The record does not indicate that the jury sought any clarification regarding self-defense. This final factor weighs against a conclusion of egregious harm.

After considering and weighing all the relevant factors, we conclude that the self-defense instruction did not cause actual harm to Appellant. *See Perkins*, 2021 WL

22

754344, at *5; *Linden v. State*, 347 S.W.3d 819, 823 (Tex. App.—Corpus Christi–Edinburg 2011, pet. ref'd) (mem. op.) (concluding that the jury charge did not cause appellant egregious harm when "the jury was given a general instruction on the law of self-defense—and specifically told that it should find [appellant] not guilty if it believed or had a reasonable doubt as to whether or not he acted in self-defense—and [when appellant's] counsel discussed self-defense in his argument before the jury"); *Barrera v. State*, 10 S.W. 3d 743, 745 (Tex. App.—Corpus Christi–Edinburg 2000, no pet.) (holding that the failure to include self-defense in the application paragraph did not cause egregious harm where the appellant relied on self-defense as a defensive theory at trial, it was urged in closing arguments, and a separate instruction on self-defense was given explaining how to properly apply the defense).

We overrule Appellant's first point.

## IV.  Noncustodial Statement

In his second point, Appellant argues that the trial court erred by admitting his video-recorded statement (State's Exhibit 171) because it was taken while he was in custody and because he had not received, nor voluntarily waived, his Article 38.22 and *Miranda* warnings.  Because the record demonstrates that Appellant was not in custody, no warnings were required.

### A.    Standard of Review and Applicable Law

We generally review a trial court's decision to admit evidence under an abuse-of-discretion standard.  *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016).

23

But here, Appellant's "objection" to his recorded statement came through a motion to suppress. The Dallas Court of Appeals has explained the standards of review that we apply in this situation:

> "In reviewing a trial court's ruling on a motion to suppress, appellate courts must view all of the evidence in the light most favorable to the trial court's ruling." *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008).
>
> We conduct our review of the trial court's ruling through a bifurcated standard of review. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). We do not engage in our own factual review, rather the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given to their testimony. *Id.* Trial courts are given almost complete deference in determining historical facts. *Id.* We are to "afford the same amount of deference to trial courts' rulings on 'application of law to fact questions,' also known as 'mixed questions of law and fact,' if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor." *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We review de novo "mixed questions of law and fact" not falling within that category. *Id.*
>
> The *Miranda* and Article 38.22 of the Texas Code of Criminal Procedure warnings were established to safeguard uncounseled individuals' constitutional privileges against self-incrimination during custodial interrogation. *See Miranda. . .* , 384 U.S. [at] 442–57[, 86 S. Ct. at 1611–19]; [Tex. Code] Crim. Proc. art. 38.22. The *Miranda* and Article 38.22 warnings are required when (1) the suspect is in custody, and (2) the police interrogate the suspect. *See Rhode Island v. Innis*, 446 U.S. 291, 300–[]02[, 100 S. Ct. 1682, 1689–90] (1980); *Henson v. State*, 440 S.W.3d 732, 742 (Tex. App.—Austin 2013, no pet.)[ (mem. op.)].
>
> . . . .
>
> Implicit in the trial court's ruling . . . is a finding that appellant was not in custody at the time [when the detective questioned him]. A trial court's ultimate "custody" determination presents a mixed question of law and fact. *Herrera v. State,* 241 S.W.3d 520, 526 (Tex. Crim. App.

2007). Therefore, we afford almost total deference to a trial court's "custody" determination when the questions of historical fact turn on credibility and demeanor. *Id.* at 527. Conversely, when the questions of historical fact do not turn on credibility and demeanor, we will review a trial court's "custody" determination de novo. *Id.*

The defendant bears the initial burden to prove that his statement was the product of custodial interrogation. *Id.* at 526. The State has no burden to show compliance with *Miranda* or Article 38.22 unless and until the record as a whole clearly establishes that the defendant's statement was a product of custodial interrogation.

*Thompson v. State*, No. 05-25-00071-CR, 2025 WL 3646155, at *9–10 (Tex. App.—Dallas Dec. 16, 2025, no pet.) (mem. op., not designated for publication); *see also Wilkerson v. State*, 173 S.W.3d 521, 532 (Tex. Crim. App. 2005) ("The mere filing of a motion to suppress does not thrust a burden on the State to show compliance with *Miranda* or [A]rticle 38.22 warnings *unless and until* the defendant proves that the statements he wishes to exclude were the product of custodial interrogation.").

The Houston Fourteenth Court of Appeals has recently set forth the law regarding how to determine if a person is in custody:

A custody determination requires two inquiries: the circumstances surrounding the interrogation and whether a reasonable person in those circumstances would have felt that he was not free to leave. *Thompson v. Keohane*, 516 U.S. 99, 112[, 116 S. Ct. 457, 465] (1995); *Wexler v. State*, 625 S.W.3d 162, 167 (Tex. Crim. App. 2021). "Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test" to determine whether there was restraint on freedom of movement of a degree associated with arrest. *Wexler*, 625 S.W.3d at 167 (quoting *Thompson*, 516 U.S. at 112[, 116 S. Ct. at 465]). The ultimate inquiry is whether, under the circumstances, a reasonable person would have believed that his freedom of movement was restricted to the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322[,

114 S. Ct. 1526, 1529] (1994); *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996).

> *Dowthitt* outlined four general situations that may constitute custody: (1) the suspect is physically deprived of his freedom of action in any significant way[;] (2) a law[-]enforcement officer tells the suspect that he cannot leave[;] (3) law[-]enforcement officers create a situation that would lead a reasonable person to believe [that] his freedom of movement has been significantly restricted[;] or (4) there is probable cause to arrest, and law[-]enforcement officers do not tell the suspect that he is free to leave. 931 S.W.2d at 255.

> For the first three situations, the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention. *Id.* For the fourth situation, the officer's knowledge of probable cause must be manifested to the suspect, and custody is established only if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe he is under restraint to a degree associated with an arrest. *Id.* An officer's subjective intent to arrest the suspect is irrelevant unless that intent is communicated or otherwise manifested to the suspect. *Dowthitt*, 931 S.W.2d at 254 (citing *Stansbury*, 511 U.S. at 324–25[, 114 S. Ct. at 1530] (explaining that police knowledge or beliefs bear on the custody issue only if they are conveyed to the suspect)).

*Duke v. State*, No. 14-24-00873-CR, 2026 WL 234669, at *8–9 (Tex. App.—Houston [14th Dist.] Jan. 29, 2026, no pet.) (mem. op., not designated for publication).

**B.     What the Record Shows**

Appellant filed a pretrial motion to suppress his statement for lack of voluntariness, arguing that he was in custody when the police interviewed him and that he had not been read his *Miranda* rights before he confessed to killing the victim. After the jury was selected and excused for the day, the trial court held a hearing on Appellant's motion to suppress.

Defense Exhibit 1, which contains in part body-camera video, was played for the trial court, and then Detective Cedillo was questioned about the video. The video started with the police at the scene of a traffic stop. The police asked Appellant to step out of the car's passenger side and patted him down. Appellant consented to have his picture taken at the scene by one of the gang-unit officers, and he took off his shirt so that his tattoos could be photographed.

When asked to ride with the officers to the station to answer questions, he agreed. He was not handcuffed at any point.

Defense Exhibit 1 also covered a portion of Appellant's questioning by police in an interview room. He agreed that he had not been handcuffed, had not been placed under arrest, and had not been told that he could not leave, and Detective Cedillo emphasized that Appellant was not under arrest and that he could leave at any time. Appellant agreed to talk to Detective Cedillo and Detective Pate as long as he was "not being accused of anything." Defense Exhibit 1 ended shortly thereafter and thus does not contain Appellant's confession.

At the suppression hearing, defense counsel asked Detective Cedillo if he considered Appellant to have been detained when the gang-unit officer took a photo of him, and Detective Cedillo said, "I wouldn't call it that. No sir." Detective Cedillo agreed that the officers kept a hand on Appellant as he walked around and that Appellant did not have access to his phone from the time that Detective Pate removed it from the car at the scene of the traffic stop until Detective Cedillo allowed Appellant

27

to refer to it to answer questions during the interview. Detective Cedillo testified that police transported Appellant from the traffic-stop location,[9] that they escorted him inside the homicide headquarters to use the restroom, that they took him back out to the patrol car, and that they then seated him in the hallway at the homicide headquarters—a private police building with controlled access into and out of the building—before starting the interview. An officer sat with Appellant in the hallway, but according to Detective Cedillo, Appellant could have walked out if he had wanted to.

Detective Cedillo explained that although Appellant was free to leave, he could not have control over his phone because Detective Cedillo had learned that there was relevant information on the phone that constituted potential evidence; to avoid the possible destruction of evidence, he did not allow Appellant to handle his phone. Defense counsel attempted to equate the probable cause to seize the phone with probable cause to seize or arrest Appellant, but Detective Cedillo explained that was not the case: "[W]e had some evidence at that point, but I don't think we were to the point of probable cause for an arrest . . . ." Detective Cedillo further explained that Appellant voluntarily agreed to the interview and that "[t]here was never an intention to arrest him or detain him."

During the State's questioning of Detective Cedillo, he reiterated that Appellant was never handcuffed, that he had agreed to come to the station, that he did not have

---

[9]Detective Cedillo testified that the doors to the backseat of the vehicle that transported Appellant could only be opened from the outside.

his own transportation because he had been a passenger in the car that was stopped, that the building's secure access was in place to protect the employees and the sensitive information that was stored in the building, that he had told Appellant that he was free to leave, and that Appellant had agreed to speak to him. Detective Cedillo never indicated that Appellant was under arrest for any crime. The State also emphasized that Appellant left the police station after the interview, that he accompanied the police to his residence for the search warrant to be executed, and that he was not arrested after the search but was allowed to leave.

After hearing arguments from counsel, the trial court found that this was not a custodial interrogation and overruled the motion to suppress, explaining that

> [Appellant] was given the choice and voluntarily went with the officers from the scene to the police department offices. That he was provided with opportunities to use the restroom. The facility allowed for [Appellant] to leave. . . . [Appellant] confirmed at both the scene and in the offices that he was not under arrest, had never been placed in handcuffs.
>
> The [c]ourt doesn't find that the police exercised a degree of control over [Appellant] that would lead him to reasonably believe he was in custody, and that is confirmed by [Appellant's] own words at the beginning of the conversation with the detective. So he arrived voluntarily. The length -- it is lengthy, but it was close to the end of the 5:00 hour the [c]ourt noticed, took some time to get back to the department, and then if they had to interview another person that was there on scene, it appears he just was the second one interviewed.
>
> There's no other indication of any requests that were denied. And again, the [c]ourt doesn't find that there was -- there was such control exerted over [Appellant] that he could have been under the impression [that] he was not free to leave. Again, what's also very important is that he said twice, both at the scene and at 10:30 at night, that he understood he was free to leave. He was not under arrest.

According to Appellant, "[t]he statement was ultimately admitted at trial as State's [E]xhibit 171." State's Exhibit 171 begins with Appellant in the interview room—not the traffic stop—and contains Appellant's confession, as well as lengthy questioning. State's Exhibit 171 overlaps with Defense Exhibit 1 as to the following: Appellant agreed that prior to the interview, he had not been handcuffed, had not been placed under arrest, and had not been told that he could not leave; Detective Cedillo, who did the bulk of the questioning, specifically stated that Appellant was not under arrest; and Appellant agreed to talk to the detectives as long as he was "not being accused of anything." State's Exhibit 171 then proceeds with Detective Cedillo's questioning Appellant regarding his activities on the day of the murder.

As Detective Cedillo began to question Appellant about his role in the murder, he did not ask to stop the interview or attempt to leave. Instead, he freely admitted that he had "shot first" because the victim had tried to pull a gun on him.

### C. Analysis

Although Appellant acknowledges in his brief that he "has the initial burden of proving that his statement was the product of custodial interrogation before these rules apply," he fails to carry that burden. Appellant argues that because the detectives had interviewed the driver first and had learned from him that Appellant had intended to rob the victim and that Appellant had admitted to the driver that he had killed the victim, the detectives knew that Appellant had been involved with the

victim's murder; thus, they had probable cause to arrest Appellant for the capital-murder offense and should have given him warnings before he told the detectives that he had shot the victim in self-defense. Appellant appears to try to fit into the fourth general situation that may constitute custody—there is probable cause to arrest, and law-enforcement officers do not tell the suspect that he is free to leave. But Appellant was told that he was free to leave. And Detective Cedillo specifically testified at the suppression hearing that he did not have probable cause to arrest Appellant at the time he was questioned, and Appellant fails to point to any place in the record showing that Detective Cedillo's knowledge of probable cause was manifested to Appellant.[10] The record shows the opposite: Detective Cedillo told Appellant that he was not under arrest and that he was free to leave. *See Gardner v. State*, 306 S.W.3d 274, 294 (Tex. Crim. App. 2009) (holding that appellant failed to establish that he was in custody under the fourth *Dowthitt* factor because regardless of whether the detective had probable cause and could have obtained an arrest warrant, he did not have one at the time of their conversation and had told appellant that he was not under arrest).

---

[10]Appellant states in his brief that "[i]t is important that the inculpatory information in the possession of detectives was manifested to Appellant during the interview. . . . By telling Appellant that they had substantial evidence against him[,] detectives wore him down until they broke him and got what they wanted." Detective Cedillo told Appellant that they knew he had been at the apartments where the victim had been shot and that they had seen Appellant in the parking lot and "burning off" right after the victim had been shot but that they needed to know the reason why the victim had been shot. At no point, however, did Detective Cedillo state that these facts equated to probable cause to arrest Appellant.

Moreover, Appellant was not handcuffed and was not physically deprived of his freedom of action in any significant way, Detective Cedillo did not tell Appellant that he could not leave, and the detectives did not create a situation that would lead a reasonable person to believe that his freedom of movement had been significantly restricted. The record demonstrates that under the circumstances, a reasonable person would not have believed that his freedom of movement was restricted to the degree associated with a formal arrest. *See Stansbury*, 511 U.S. at 322, 114 S. Ct. at 1529; *Dowthitt*, 931 S.W.2d at 254. Because Appellant did not meet his burden to show that he was in custody when he gave his statement, the rules for giving warnings were not triggered. *See Thompson*, 2025 WL 3646155, at *11 ("Based on the record before us, we [hold that] the trial court did not err [by] concluding that the video did not depict a custodial interrogation for which *Miranda* and Article 38.22 warnings are required.").

We hold that the trial court did not err by denying Appellant's suppression motion and by admitting his noncustodial statement that is reflected in State's Exhibit 171. *See Gardner v. State*, 433 S.W.3d 93, 99–100 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (holding that trial court did not err by denying motion to suppress when the defendant was not handcuffed, willingly accompanied officers to the patrol car, was told that he could terminate the interview and leave at any time, and was not arrested until several weeks after officers executed a search warrant on his home). Accordingly, we overrule his second point.

## V.  Conclusion

Having overruled Appellant's two points, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  July 23, 2026